IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2021

## STATE OF TENNESSEE v. JUSTIN KENNETH BLANKENBAKER

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-791     Cheryl A. Blackburn, Judge**

_____

### No. M2020-01436-CCA-R3-CD

_____

The Defendant, Justin Kenneth Blankenbaker, was convicted by a jury of first-degree premeditated murder, arson, and abuse of a corpse, and the trial court imposed an effective sentence of life imprisonment plus five years. On appeal, the Defendant contends that (1) there was insufficient evidence to support his conviction for first-degree murder, specifically, challenging the element of premeditation; and (2) there was insufficient evidence to support his conviction for arson because he did not knowingly damage any structure. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jay A. Umerley (on appeal); and Michael A. Colavecchio (at trial), Nashville, Tennessee, for the appellant, Justin Kenneth Blankenbaker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan M. King and Joey Clifton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case involves a February 7, 2016 fight between the Defendant and Horace Horton ("the victim") at an East Nashville homeless camp, following the conclusion of which the Defendant set the victim's body on fire. Thereafter, on May 17, 2016, a Davidson County Grand Jury returned a three-count indictment against the Defendant, charging him with first-degree premeditated murder, arson, and abuse of a corpse in

relation to these events. See Tenn. Code Ann. §§ 39-13-202, -14-301, -17-312. The Defendant proceeded to a jury trial, where the following proof was adduced.

Daniel Selfridge testified that his stepson was friends with the victim, that the victim lived in a nearby homeless camp, and that the victim often visited Mr. Selfridge's home. On February 7, 2016, around 2:10 p.m., Mr. Selfridge was in his driveway working on his car when the victim approached him, and the pair started talking. According to Mr. Selfridge, the Defendant arrived at some point during Mr. Selfridge's conversation with the victim. After making contact with the pair, the Defendant shook Mr. Selfridge's hand and apologized for what had happened the previous night with Mr. Selfridge's stepson, though Mr. Selfridge did not know specifically to what the Defendant was referring. After about five minutes more of conversation, the victim and the Defendant congenially walked away together. Mr. Selfridge confirmed that the victim was intoxicated and showed off an orange "steak knife" in the driveway. The Defendant did not appear intoxicated, in Mr. Selfridge's opinion.

Mr. Selfridge and his wife later departed from their residence around 2:40 p.m. in order to drop off some items at the homeless camp where the Defendant and the victim lived. While driving, they encountered the Defendant and the victim walking toward the camp. They stopped to speak with the men, and the Defendant informed the couple that he was displeased with Robert "Happy" Welchal, whom the Defendant believed was stealing his belongings.

Later that day, between 6:00 and 6:30 p.m., police officers and fire crews responded to a fire at the homeless camp. When Metro Nashville Police Department ("MNPD") Detective Clinton Schroeder arrived, he observed fires in two different locations—one was "in the far back" of the camp where things were "fully engulfed," while the other was "a little more forward" in the camp and looked more "like a campfire." As firefighters worked to extinguish the fire in the back of the camp, Detective Schroeder returned to the smaller fire in the front of the camp, which was approximately one hundred yards away; however, as Detective Schroeder approached, he realized that the "campfire" was actually the victim's body, which had been set aflame. MNPD Detective James Rummage explained that the victim's body appeared to be inside the camp's fire pit area. There was no evidence that the victim's body had been dragged or moved to its final resting place.

Detective Schroeder testified that the victim's body was so severely burned that he could not tell the ethnicity of the body. He also observed several places on the victim's body "where the skin had been broken in marks that were approximately a quarter inch tall and an inch and a half wide." MNPD Crime Scene Investigator Courtney Bouchie testified that despite the body's charred condition, she observed "two very distinctive, irregular shaped areas of blunt force trauma on the [victim's] forehead." Detective Rummage also saw "severe trauma in the head area of the body."

Nashville Fire Department Investigator Kevin Neville testified that around the victim's body, he observed "quite a bit of blood," an empty container of lighter fluid, and a "concrete block that had what appeared to be blood and hair matted to it." Investigator Bouchie described that she saw a thirty- to thirty-five-pound cinder block, a nearly empty bottle of lighter fluid, a milk crate, and a lot of blood spatter near the victim's body.

MNPD Investigator Charles Linville measured and documented the scene for the purposes of creating a diagram. He stated that "there were no structures at the crime scene" and that he had to drive spikes into the ground to use as reference points for measurements. He explained that there were "no set structures" at the crime scene to use as fixed points to take measurements.

Investigator Neville, in his expert opinion, confirmed that the burn patterns on the victim's body were consistent with an ignitable liquid's being poured on the body. Tennessee Bureau of Investigation ("TBI") Agent Randall Nelson, an expert in the field of forensic trace analysis, testified that the "charred material from [the] victim," the burned socks and clothing removed from the victim's body, and the white plastic bottle containing clear liquid recovered from the crime scene, all revealed the presence of a medium petroleum distillate, which included such things as some charcoal starters, some torch fuels, and some lamp oils.

At the time of the killing, the Defendant was thirty-one years old, six feet two inches tall, and weighed 180 pounds. Whereas, the victim was fifty-five years old, five feet six inches tall, and weighed 117 pounds.

TBI Agent Rachel Mack was declared an expert in the field of DNA analysis, and she testified that the she completed DNA testing of the items in this case. According to Agent Mack, none of the blood from the crime scene could be matched to the Defendant's DNA profile, and the vast majority of the blood specimens from the scene belonged to the victim.

Dr. Erin Carney, a forensic pathologist for the Davidson County Medical Examiner's Office,[1] testified that the victim's body was significantly burned with charring on the skin of the head, arms, legs, and torso, covering approximately eighty percent of his body surface area. Dr. Carney explained that the victim suffered significant injuries, including two open lacerations above his right eyebrow—one about seven-eighths of an inch long, and the other almost two inches long; Dr. Carney opined that these injuries were consistent with the victim's being hit with a concrete block. Upon further examination of the victim's head, Dr. Carney observed scalp hemorrhaging, as well as a significant skull fracture, which she described as the victim's skull being pushed inward and extending all

---

[1] Another examiner performed the victim's autopsy, and Dr. Carney testified pursuant to the autopsy report.

the way across the base to the other side. The victim also had bleeding on his brain from torn blood vessels, as well as bruising on the left side of the brain, though the impact to the victim's head came from the right.

Dr. Carney opined that it was "a pretty hard hit" to cause the degree of damage observed to the victim's skull. She also said that the victim's skull was crushed using a "significant amount of force" similar to what was usually seen in car crashes. She explained that the victim's injuries could have come from one hard blow or that it was possible there were multiple hits, noting that there were two injuries above the victim's right eyebrow, but she could not conclusively say for certain either way.

Dr. Carney relayed that the victim's cause of death was head trauma from blunt force injuries and that the manner of death was homicide. Dr. Carney agreed that the victim passed away due to the blow or blows from the cinder block before his body was set on fire, noting that internal analysis of the victim's body showed there was no soot in his throat or carbon monoxide in his blood. In addition, toxicology showed that the victim had a blood alcohol level of .27 and benzodiazepines in his system at the time of death.

Around midnight the night of the crime, the Defendant returned to the homeless camp, and he was subsequently taken to the police station for an interview. MNPD Detective William Bolan interviewed the Defendant. Detective Bolan also interviewed Mr. Welchal that evening.

Relative to the Defendant's interview, the Defendant informed Detective Bolan that he had been walking around downtown drinking and smoking crack cocaine approximately three hours prior to the interview. The Defendant denied all involvement in the killing, and he said that he had never had any problem with the victim and hypothesized that Mr. Welchal killed the victim. According to the Defendant, he had not been at the camp in two and one-half days following an altercation with the victim's friend, "Bucket." Regarding the Defendant's visible injuries, he claimed that he had been downtown that evening where he was robbed and beaten by two Black men; however, because neither the police nor security at a local bar would help him, he returned to the camp. The Defendant's injuries were photographed, including injuries to both hands, the left side of his face and forehead, his left ear, and the right side of his neck.

A few days later, on February 12, the Defendant contacted the police and volunteered for another interview. This time, the Defendant confessed to Detective Bolan that he killed the victim with a cinder block before setting the body and his own tent on fire. The Defendant acknowledged that his prior story about being robbed was untrue.

The Defendant told Detective Bolan that the victim drank too much and that the victim was frequently hostile, often pulling knives on people and making threats. The

Defendant also stated that the victim suffered from mental health issues and was suicidal at times.

The Defendant explained that he was drinking with the victim at the camp on February 7, when the victim "flipped out" and pulled an orange knife on him. He stated that he easily took the victim's knife away, grabbing it by the blade; however, the victim then hit the Defendant in the head with a plastic milk crate or a log, knocking the Defendant to the ground. The Defendant proceeded to beat the victim in a fight that he described as "pretty one-sided," lasting approximately thirty seconds. The Defendant said that he punched the victim and kicked him with his steel-toed boots and that following the fight, the victim was left lying on the ground "choking and gurgling with blood." According to the Defendant, the victim landed in the campfire when he fell to the ground.

During the interview, the Defendant indicated that he "probably" went back into his tent to change clothes. Detective Bolan estimated that it would have taken the Defendant "[l]ess than a minute," "thirty seconds," to walk from the fire pit area where the victim was lying after the fight to the Defendant's tent.

The Defendant decided that he wanted to end the victim's suffering because "it was more than an a-s whooping," and he felt there "was no recovering from what happened" to the victim. The Defendant collected a nearby cinder block, returned to the area where the victim was lying on the ground, and threw the cinder block at him. After throwing the block, the Defendant did not know if the victim was dead or alive. But instead of calling for help, he sprayed lighter fluid on the victim's body and lit him on fire. Next, the Defendant doused his own tent with lighter fluid and set it on fire, acknowledging that the clothes he had on when he killed the victim were burned inside. The Defendant indicated that his tent contained six propane canisters that eventually exploded.

After setting the fires, the Defendant left the camp and smoked crack cocaine while walking around downtown Nashville. Mr. Welchal was not present when these events occurred, according to the Defendant.

Mrs. Selfridge, who had been to the homeless camp before, testified that the Defendant's and Mr. Welchal's tents were located down a trail leading toward the back of the camp area and were positioned next to each other. Detective Bolan testified that both Mr. Welchal's and the Defendant's tents were destroyed, and a photograph of the damage was admitted into evidence.

Detective Bolan confirmed that he returned to the homeless camp during the daylight hours of February 8. When he returned, he found an orange sheathed knife at the crime scene.

Benjamin Johnson testified that he worked as a manager of Honky Tonk Central, a downtown Nashville bar, on the night of February 7, 2016. According to Mr. Johnson, between 10:30 and 11:00 p.m., a Caucasian man with short brown hair and a goatee, approximately six feet, one to two inches tall, was present in front of the bar "causing problems" and wanting to go inside the bar.[2] The man, who had an injury to the left side of his head with dried blood around it, told Mr. Johnson that seven men had tried to stab him, but his story to Mr. Johnson kept changing. Mr. Johnson said that the man became agitated and angry when Mr. Johnson would not let him into the bar and stayed out front of the bar for almost an hour "causing problems, just harassing people." The man returned to the bar again later and tried to enter, but was again turned away. After the man had left the area, Mr. Johnson provided the police with his description and pointed them in the direction the man left walking.

The Defendant moved for judgment of acquittal, arguing that the State had failed to prove premeditation for first-degree murder and that the State had failed to establish that the Defendant burned a structure to support an arson conviction. The trial court determined that the Defendant's statement to police about wanting to end the victim's suffering after the victim was lying on the ground following the fight showed premeditation. Relative to the Defendant's arson argument, the trial court stated that a structure was a term of "common parlance as a structure for their living" and noted that this was their home. For these reasons, the trial court overruled the motion.

The Defendant called three witnesses in an effort to establish a claim of self-defense. He first called Lindsey Krinks, who worked for a homeless outreach organization in February 2016 and was familiar with both the victim and the Defendant. On Friday, February 5, 2016, Ms. Krinks went to the homeless camp and visited with the victim, who was "drinking heavily and wanted detox." Because the victim was dealing with mental health issues, he asked to be taken to a hospital for treatment, though he later left the hospital that same evening against medical advice, according to Ms. Krinks. Also, on Friday, February 5, 2016, when Ms. Krinks was at the camp, she saw the Defendant punch Mr. Welchal. Ms. Krinks intervened in the fight, and the Defendant stormed off screaming and throwing things. This behavior was abnormal for the Defendant, according to Ms. Krinks, and she believed that he was under the influence of drugs and alcohol at the time.

Shortly after the victim left the hospital, the victim called Ms. Krinks and left a voicemail threatening the Defendant, "saying his day ain't gonna be good[.]" The victim also indicated during the message that he was upset with the Defendant because the Defendant had "charged [the victim's] friend," Bucket, with two knives. Ms. Krinks was also present at the camp after the victim left the hospital, and she observed the victim threaten "everybody in the area," including the Defendant. According to Ms. Krinks, the

---

[2] Mr. Johnson could not identify the Defendant in court.

victim believed that someone in camp was stealing his belongings. Ms. Krinks agreed that the Defendant was much larger and stronger than the victim.

Ms. Krinks confirmed that the victim carried two knives—one in his pocket and one in his boot. He had to remove both knives from his person when Ms. Krinks took him to the hospital on February 5. Ms. Krinks acknowledged that the victim was "crotchety" and would frequently "mouth off a lot." In addition, Ms. Krinks had seen the victim pull out knives and threaten people at the shelter she ran.

The Defendant then called Julie Miles, who ran a homeless ministry at the time of the crime. In this capacity, she regularly saw the Defendant and the victim in the months leading up to the victim's death. Ms. Miles testified that on the day before the victim's death, she was at the homeless camp, and the victim told her that he was going to "stab [the Defendant] a hundred times and throw him in the river." Ms. Miles confirmed that the Defendant was much younger, larger, and stronger than the victim; that the victim carried a knife with him at all times; and that the victim was aggressive if provoked. She also agreed that the victim was upset with the Defendant because the Defendant had threatened and fought with Bucket, the victim's friend.

Finally, the Defendant presented Cassandra Hounshell, who worked with "a group that assisted the homeless community" at the time of the crime, visiting the camps and making sure they had the basics to survive. She testified that she also frequently encountered and interacted with both the victim and the Defendant. According to Ms. Hounshell, on the day before the crime, she visited the homeless camp, and the victim, who was holding a knife, told her that he had "put a hundred holes" in the Defendant and "threw him in a river." This statement from the victim made Ms. Hounshell nervous, so she left the camp. Ms. Hounshell confirmed that she had previously seen the victim carrying a knife. Finally, Ms. Hounshell testified that she had previously been involved in a romantic relationship with the Defendant and that the Defendant confessed to her that he killed the victim.

Following the conclusion of proof, the Defendant was convicted as charged, and the trial court imposed an effective sentence of life imprisonment plus five years. The Defendant's timely motion for new trial was denied, and this appeal followed.

ANALYSIS

On appeal, the Defendant contends that there was insufficient evidence to support premeditation for his first-degree murder conviction and insufficient evidence to establish he knowingly damaged a structure relative to his arson conviction.[3] An appellate court's

---

[3] He does not challenge the sufficiency of the evidence supporting his abuse of a corpse conviction.

standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

*I. Premeditated First-Degree Murder*

The Defendant contends that the evidence adduced at trial was insufficient to support his conviction for first-degree murder, specifically, challenging the element of premeditation. The Defendant submits, instead, that the victim provoked him and that he immediately reacted in self-defense. In support of his argument, the Defendant cites to his police statement, wherein he told police that the victim attacked him with a knife; that he disarmed the victim; that the victim then blind-sided him with a milk crate or log; that he did not fight back until hit with the milk crate or log; that "[a]fter knocking the victim to the ground with his fists," he hit the victim with a cinder block; and that the entire fight lasted thirty seconds. The State responds that based upon all of the evidence presented, the element of premeditation was sufficiently established, asserting that the proof showed that the Defendant, after viciously beating the victim, walked back to his tent, collected a cinder block, and returned to the scene to "end [the victim's] suffering."

Premeditated first-degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial

evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

A self-defense instruction was also given in this case. In Tennessee, a person who is not engaged in unlawful activity may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). If the person was engaged in unlawful activity, there is a duty to retreat before using deadly force. See State v. Perrier, 536 S.W.3d 388, 394-401 (Tenn. 2017). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

In the light most favorable to the State, the evidence of premeditation was fairly overwhelming in this case. In the Defendant's statement to police, he admitted that he brutally beat the victim after the victim hit him with a milk crate or log, punching the victim and kicking him with steel-toed boots. According to the Defendant, the victim was lying on the ground "choking and gurgling with blood" following the fight. The Defendant then walked back to his tent, which was approximately one hundred yards away from the fight to change his clothes; the walk between the two sites took between thirty seconds and one minute. In addition, the Defendant said that because there "was no recovering from what happened," he decided to "end [the victim's] suffering" rather than render aid. The Defendant procured a cinder block and returned to the location where the now unarmed victim was lying on the ground. He threw the thirty- to thirty-five-pound cinder block at the victim. The medical examiner's testimony indicated that it was possible the victim suffered more than one blow to the head, noting the two injuries above the victim's right eyebrow. The medical examiner also opined that the victim was hit with a "significant amount of force" to cause the degree of damage she observed to the victim's skull, force of a magnitude similar to that seen in car crashes. The Defendant admitted that he set the victim's corpse and his own tent on fire, including the clothes that he wore when he killed the victim. He then left the area, walking around downtown Nashville drinking and smoking crack cocaine. When questioned by the police, the Defendant originally denied all involvement in the crime.

In addition, the Defendant was significantly taller and larger than the victim. Though the Defendant claimed that the victim started the fight, the Defendant acknowledged in his own police statement that the fight had ended by the time he crushed the victim's skull with the cinder block. Though the jury heard from the defense witnesses about the victim's propensity for violence, the jury, by its verdict, discredited the

Defendant's claim that he acted in self-defense, as was its prerogative. The Defendant is not entitled to relief on this basis.

## II. Arson

The Defendant also challenges the sufficiency of the evidence supporting his conviction for arson, arguing that the State failed to prove he knowingly damaged a structure. The Defendant states that after the fight, he set the victim's corpse on fire and that the fire spread to the nearby tents, and he also contends that a tent is not structure for purposes of the arson statute. The State responds that the evidence established that the Defendant knowingly damaged a structure, noting that the Defendant admittedly burned his own tent and that the fire spread to Mr. Welchal's tent. The State further asserts that the natural and ordinary meaning of the term structure includes Mr. Welchal's tent.

Relevant to this case, a person can be found guilty of arson when that person knowingly damages any structure or farm equipment by means of a fire or explosion without the consent of persons who have a possessory, proprietary, or security interest therein. Tenn. Code Ann. § 39-14-301(a)(1). Arson of a structure or farm equipment is a Class C felony. Tenn. Code Ann. § 39-14-301(b)(1).

Arson does not "require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure." State v. Gene Shelton Rucker, Jr., No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004). Rather, "the nature of the conduct—creating a fire or explosion—that causes the damage to the structure is consequential and central to the offense." Id. Thus, the knowing mens rea for arson is satisfied where "the person is aware of the nature of the conduct" or the accompanying circumstances. See id.

In addition, a different variety of arson is set forth in section 39-14-303, which provides that "[a] person commits arson who knowingly damages any personal property, land, or other property, except buildings or structures covered under § 39-14-301, by means of a fire or explosion." (Emphasis added). Arson under this section, which expressly excludes buildings and structures, is a Class E felony. Tenn. Code Ann. § 39-14-303(b). Thus, the central issue in this case is whether the tents, as being used by the individuals in the homeless camp, should be considered as structures for purposes of section 39-14-301 or whether they are merely personal or other property governed by section 39-14-303.

"In resolving questions of statutory construction, we are guided by the following 'well-defined precepts.'" State v. Frazier, 558 S.W.3d 145, 152 (Tenn. 2018) (citing Tenn. Dep't of Corr. v. Pressley, 528 S.W.3d 506, 512 (Tenn. 2017). "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." State v.

- 11 -

Howard, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).  "In evaluating the constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional," and "indulge every presumption and resolve every doubt in favor of the statute's constitutionality."  Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003) (citations omitted); State v. Taylor, 70 S.W.3d 717, 721 (Tenn. 2002).

"When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use."  Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004).  A statute is ambiguous when "the parties derive different interpretations from the statutory language."  Howard, 504 S.W.3d at 270 (quoting Owens, 908 S.W.2d at 926).  However, "[t]his proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute.  A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute."  Powers v. State, 343 S.W.3d 36, 50 n.20 (Tenn. 2011).  In other words, both interpretations must be reasonable in order for an ambiguity to exist.  Id.  If an ambiguity exists, however, "we may reference the broader statutory scheme, the history of the legislation, or other sources" to determine the statute's meaning.  Frazier, 558 S.W.3d at 152-53 (internal citations omitted).

Regarding the requisite structure referred to in section 39-14-301, this court has observed the following:

> [T]he term "structure" is not defined by the arson statute.  However, the comments to the arson statute denote that the current language of "damages any structure" replaced prior language, which covered "any house, or outhouse, or any building, or any other structure . . . ." [Tenn. Code Ann.] § 39-14-301, [Sentencing Comm'n Cmts.]  According to Black's Law Dictionary, structure is any "construction, production, or piece of work artificially built up or composed of parts purposefully joined together."  Id. at 1464 (8th ed. 2004).  According to Webster's II New College Dictionary, structure is "something constructed, such as a building."  Id. at 32 (3rd ed. 2005).

State v. Matthew Lee Rogers, No. E2005-01142-CCA-R3-CD, 2006 WL 2716870, at *4-5 (Tenn. Crim. App. Sept. 25, 2006) (finding that wall-to-wall carpeting was a permanent and integral part of the apartment building structure); see also State v. Elvis Strickland, No. W2015-00153-CCA-R3-CD, 2015 WL 9412829, at *3-4 (Tenn. Crim. App. Dec. 22, 2015) (holding that the liquor store's floor, windows, and countertop were fixtures that had become part of the structure itself).  However, unlike Rogers and Strickland, we are not dealing with a fixture appurtenant to a structure or building but rather with a tent, which could be both a temporary shelter when assembled or personal property when being stored.

- 12 -

Moreover, any type of item with an element of construction could be considered as a structure, such as a swing set, gazebo, or doghouse. Accordingly, we find the word "structure" as used in section 39-14-301 to be ambiguous.

Because the term structure is ambiguous, we find guidance in the broader statutory scheme. Title 39, Chapter 14 deals with offenses against property. Arson is governed in Part 3. Part 4 deals with trespass and related offenses. In the Part 4, habitation is defined as "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons[.]" We find this definition in the broader statutory scheme to be reflective of the legislature's intent regarding the term structure as used in section 39-14-301 without unduly restricting or expanding the statute's coverage beyond its intended scope. Accordingly, the term structure as used in the arson statute includes the homeless camp tents in this case because they were fully assembled and being used for the overnight accommodation of persons.

Moreover, though the crime-scene investigator testified, as the Defendant points out, that "there were no structures at the crime scene," the investigator was referencing that there were "no set structures" at the crime scene to use as a fixed point to take measurements. Furthermore, the investigator's use of the term structures is not definitive for purposes of the legal definition.

What is more, the Defendant incorrectly states in his brief that the State's theory for arson was that the Defendant set the victim's corpse on fire and that the fire spread to the nearby tents. To the contrary, the Defendant admitted that he set his own tent on fire, and it was this fire that exploded, spread, and ultimately burned down the neighboring tent belonging to Mr. Welchal. Mrs. Selfridge confirmed that Mr. Welchal's tent was located next to the Defendant's, and Detective Bolan testified that both tents were destroyed. A photograph was entered into evidence showing the damage to the tents. Based upon the evidence presented in this case, a reasonable juror could have concluded that the Defendant knowingly damaged a structure by means of a fire or explosion without the consent of persons who have a possessory, proprietary, or security interest in the structure.

CONCLUSION

Based upon the foregoing, we find the evidence sufficient to support the Defendant's convictions for first-degree premeditated murder and arson. The judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

- 13 -